IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT COMRIE,                              :
           Plaintiff                   :
      v.                                 : Case No. 3:17-cv-27-KAP
DENISE WOOD, *et al.*,                     :
           Defendants                  :

Memorandum Order

Plaintiff's motion for clarification, ECF no. 56, is granted as follows: no further materials are needed to decide the summary judgment motions. Plaintiff's motion for summary judgment, ECF no. 30, is denied, defendants' motion for summary judgment, ECF no. 34, is granted, and judgment is ordered to be entered for the defendants.

Plaintiff Robert Comrie was confined by the Pennsylvania Department of Corrections on a 2-4 year sentence of imprisonment imposed in the Clearfield County Court of Common Pleas, but in the end served a term considerably beyond four years. He sues three individuals that he alleges caused this because they were deliberately indifferent to the correct computation of prior custody credit for his sentence, defendants Vincent Mazeski and Randall Sears, attorneys employed by the Department of Corrections, and Denise Wood, the records administrator in the Office of Population Management and Sentence Computation. Deliberate indifference to imprisonment beyond the term of a sentence has been a recognized cause of action in this circuit at least since Sample v. Diecks, 885 F.2d 1099, 1110 (3d Cir.1989) and Moore v. Tartler, 986 F.2d 682, 686 (3d Cir.1993).

As will be explained, to the extent that there are villains in this story, they are judges, and after Stump v. Sparkman, 435 U.S. 349, 359 (1978), a judge is absolutely immune from liability for judicial acts such as sentencing even if those acts are "flawed by the commission of grave procedural errors," or even the product of bad faith or malice, *see* Mireles v. Waco, 502 U.S. 9, 11, (1991). Judicial immunity does not apply to a judge's nonjudicial acts, or to judicial acts taken in the complete absence of all jurisdiction. But imposing an incorrect or illegal sentence or failing to correct an incorrect or illegal sentence are not acts taken in the complete absence of all jurisdiction.

Judges' orders are carried out almost entirely by non-judge actors, some of whom share in judicial immunity, and some of whom do not. When an official is ordered by a judge to take an action that subsequent events prove to be wrong, and even when the official believes the order is wrong, that official still has a legal duty to follow a facially valid order.

1

Affirming the grant of summary to Pittsburgh against a lawsuit that charged Pittsburgh with racial discrimination for its practice of promoting police officers in accordance with a racial quota from 1979 to 1993, the appellate panel observed that a judicial judgment imposed the quota and:

> [T]he City faced but one real course—a Hobson's choice—to follow the court's order. As such, the City has not deliberately adopted an "official policy," other than to follow the law, that would give rise to section 1983 liability. *See* Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 1299–1300, 89 L.Ed.2d 452 (1986); *cf*. Lockhart v. Hoenstine, 411 F.2d 455, 460 (3d Cir.1969) ("[A]ny public official acting pursuant to court directive is [ ] immune from suit"); Turney v. O'Toole, 898 F.2d 1470, 1472–73 (10th Cir.1990) (citations omitted) ("officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed in that order.... 'Facially valid' does not mean 'lawful.' An erroneous order can be valid.

Wolfe v. City of Pittsburgh, 140 F.3d 236, 240 (3d Cir. 1998). As the Tenth Circuit implied in the case cited with approval in Wolfe, imposing liability on nonjudicial officials for obeying erroneous orders would universally impair the effectiveness of the judiciary in at least two ways. Recipients of judicial orders would, in addition to relying on already established procedures for error correction, themselves have to act as "pseudo-appellate courts;" additionally, allowing collateral litigation against those with the duty to execute judicial orders would give disappointed litigants the means for obstructing those orders. Turney v. O'Toole, *supra*, 898 F.2d at 1473.

This is consistent with other analyses of liability when an official obtains legal advice about a course of action, although in such cases the question more often addressed is whether an individual defendant is protected by qualified immunity. *See* Kelly v. Borough of Carlisle 622 F3d 248 (3d Cir. 2010). In Kelly, the Court of Appeals observed that one reason the Borough of Carlisle was not deliberately indifferent to the risk of an arrest without probable cause was its policy of having police officers consult the District Attorney's Office prior to arrest and follow the attorney's advice about whether there was probable cause for an arrest. Such a policy "tends to negate deliberate indifference because a policy of consulting with a lawyer in uncertain cases usually prevents unlawful arrest." *Id*., 622 F.3d at 264.

This does not enshrine the Nuremberg defense as a principle of American law, either criminal, *see* United States v. Funmaker, 10 F.3d 1327, 1331 (7th Cir. 1993), or civil, *see* S.E.C. v. Hughes Capital Corp., 124 F.3d 449, 454 (3d Cir. 1997)(affirming grant of summary judgment against defendant for negligence for completing transactions in fraudulent scheme because the transactions "were so clearly suspicious.") How clearly wrong an order has to be before an official must disobey it is a question of qualified immunity: officials are shielded by qualified immunity from liability for money damages

when their conduct does not violate clearly established legal rights. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). If official defendants "reasonably but mistakenly conclude[]" that their conduct conformed to the law they are entitled to immunity. Hunter v. Bryant, 502 U.S. 224, 227 (1991) (*per curiam*). To be liable an official must have "fair warning" that "specific acts were unconstitutional." Taylor v. Riojas, 141 S. Ct. 52, 53, 208 L. Ed. 2d 164 (2020)(*per curiam*).  In the closest case I can find, making an error of law that is subsequently deemed to be "unreasonable" is not enough to be considered deliberate indifference. Campbell v. Florian, 972 F.3d 385, 397 (4th Cir. 2020), as amended (Aug. 28, 2020).  Here, I believe the undisputed facts do not permit the conclusion that the defendants were deliberately indifferent, and so *a fortiori* could not find that defendants' actions were so unreasonable in light of settled law that they would forfeit qualified immunity.

The historical facts are derivable from undisputed documents.  On January 16, 2002, a federal grand jury in the Northern District of Ohio returned an indictment charging Comrie with making false statements in connection with the purchase of a firearms while Comrie was under indictment on felony charges in the state of Ohio, charges he was convicted on in 2000. United States v Comrie, Case No. 1:02-cr-18 (N.D.Ohio), *aff'd in part and remanded for resentencing,* 136 Fed.Appx. 883 (6th Cir. 2005), *motion to vacate denied,* 2009 WL 1373148, at *3 (N.D. Ohio May 15, 2009), *aff'd,* 455 Fed.Appx. 637 (6th Cir.), *cert. denied* 566 U.S. 1003 (2012). A warrant was issued for Comrie's arrest; three days later on January 19, 2002, the Pennsylvania State Police arrested Comrie on the federal warrant and placed him in the Clearfield County Jail.  A search at the time of arrest disclosed that Comrie possessed controlled substances. Comrie was charged with possession of controlled substances in the Clearfield County Court of Common Pleas. Commonwealth v Comrie, CP-17-CR-134-2002 (C.P. Clearfield)

Comrie did not remain in Clearfield County pending disposition of the state charges. In early February 2002, the Northern District of Ohio issued a writ *ad prosequendum* to obtain custody of Comrie, and he was transferred into federal custody. Under such circumstances state custody remains primary, and the federal court is considered to be borrowing the defendant. *See e.g.* Vasquez-Alcazar v. Ebbert, 373 Fed. Appx. 146, 147 (3d Cir. 2010). Comrie was convicted in federal court on September 20, 2002, and then returned to Clearfield County.

On October 3, 2002, Comrie pleaded guilty to possession with intent to distribute. President Judge Fredric Ammerman sentenced Comrie to 3 to 5 years of imprisonment. There was no direct appeal.

When a defendant is sentenced to more than two years the sentence may (or must, if the sentence is five years or more) be served in the state prison system. The sentence is communicated from the county to the DOC on a DC-300B Court Commitment form.  In

Comrie's case the DC-300B Court Commitment form submitted to the DOC noted that Comrie had been "continuously incarcerated since 1-21-02" under the "Credit for Time Served" box, and credited him with time served from January 21 until October 3, 2002. The DC16E Sentence Status Summary form dated November 7, 2002, indicates that Plaintiff's sentenced was calculated using January 21, 2002, as the effective date.

Comrie arrived in DOC custody on October 16, 2002. He was subsequently borrowed a second time on a writ *ad pros* by the Northern District of Ohio from December 9, 2002, to March 24, 2003, in connection with his federal charges.  On February 25, 2003, the federal court imposed an aggregate sentence of 100 months imprisonment on Comrie, followed by a term of supervised release. Comrie was again returned to the DOC.

In addition to pursuing a direct appeal of his federal sentence, Comrie filed a timely collateral attack on his sentence under Pennsylvania's Postconviction Relief Act, arguing that his plea counsel was ineffective. Judge Ammerman granted Comrie relief and vacated his conviction and sentence on September 30, 2004. The DOC accordingly returned Comrie to the Clearfield County Prison as a pretrial detainee. The second time around, Comrie entered a counseled negotiated guilty plea and on December 14, 2004, Judge Ammerman imposed a sentence of 2-4 years of imprisonment, to be served "consecutive to any federal sentence currently being served." *See* Commonwealth v. Comrie, No. 551 WDA 2012, 2013 WL 11280970, at *1 (Pa.Super. Feb. 26, 2013).

Once again, the DC-300B form following imposition of this sentence indicated that Comrie had been in custody since January 21, 2002, in the "Credit for Time Served" box. Because the state court sentence was consecutive to the federal sentence, Comrie was released to the Bureau of Prisons on December 22, 2004, to begin serving his federal sentence.

While in federal custody in Colorado, Comrie made an unsuccessful *pro se* effort to have the period he spent in custody from his arrest in January 2002 to his arrival in BOP custody in December 2004 credited to his federal sentence. Comrie v. Wilner, 2009 WL 1438624 (D.Colo.2009), *aff'd*, 380 Fed. Appx. 783 (10th Cir. 2010). Federal law prohibits double credit for time in custody, and as Judge Weinshienk and the Tenth Circuit explained, they considered Comrie to have been in primary state custody during this time, and as of 2010 believed that period had been credited to Comrie's state sentence. *Id.*, 380 Fed.Appx. at 785. In 2002, no one had expressly decided in whose custody Comrie was: throughout proceedings on the habeas petition in 2009 and 2010 the federal courts reasoned backwards that because a writ *ad pros* was issued Comrie must have been in state custody.

While in federal custody, Comrie filed second, third, and fourth PCRA petitions in Clearfield County. *See* Commonwealth v. Comrie, No. 551 WDA 2012, 2013 WL 11280970,

at \*2 (Pa.Super. Feb. 26, 2013). In his fourth PCRA petition filed in December 2009, Comrie made a parallel effort to obtain credit toward his state sentence for the time in custody after his arrest. Comrie sought other relief as well, including having his state sentence converted to one concurrent with the federal sentence. In an Order dated June 9, 2011, Judge Ammerman granted Comrie relief on the custody credit issue, writing that "[Comrie's] request to amend his sentencing order is granted to the extent he should receive time credit for the period between January 19, 2002 to December 22, 2004." ECF no. 37-1 at 89. Judge Ammerman reasoned that "although there were periods of time when [Comrie] was not actually in the county jail or state prison, because he was only temporarily in the federal government's custody, said time should be credited towards his state sentence." Id.  In a footnote Judge Ammerman referenced the Tenth Circuit's denial of relief on Comrie's federal *habeas corpus* petition. Judge Ammerman denied all other relief sought in the PCRA petition.

Comrie had proceeded under the PCRA, which is not ordinarily designed to correct custody credit issues. Simple mistaken computation of sentence by the DOC is corrected in an action for mandamus in the Commonwealth Court. *See* Allen v. Commonwealth, Department of Corrections, 103 A.3d 365, 370 (Pa.Cmwlth. 2014) ("[M]andamus is an appropriate remedy to correct an error in DOC's computation of maximum and minimum dates of confinement where the sentencing order clearly gives the inmate credit for the time period in question and DOC's computation does not comply with that credit.") However, at this point Comrie was not in the DOC's custody and the DOC had not failed to comply with Judge Ammerman's order, and Comrie was familiar with the PCRA. Judge Ammerman, with the agreement of the Clearfield County District Attorney's Office, overlooked any error in the vehicle Comrie used to bring the sentence credit issue to Judge Ammerman attention.

The PCRA has a one-year limitations period from the date a petitioner's sentence is final (with exceptions not applicable to Comrie) and under Pennsylvania law this limitations period is jurisdictional. Comrie made a mistake by taking an appeal from Judge Ammerman's denial of the other relief Comrie sought in his fourth PCRA. Approximately one year after Judge Ammerman granted Comrie relief on the custody credit issue, the Pennsylvania Superior Court held that the PCRA petition had been untimely because Comrie's conviction was final in January 2005, and because Judge Ammerman had no jurisdiction he had no authority to grant any relief sought therein. The Superior Court thus held Judge Ammerman's award of custody credit "is void and must be vacated;" the court affirmed the denial of all other relief. Commonwealth v. Comrie, No. 1232 WDA 2011, unpublished memorandum at 1–6 (Pa.Super. May 31, 2012), *quoted passim in* No. 551 WDA 2012, 2013 WL 11280970 (Pa.Super. Feb. 26, 2013).

Comrie, still in federal custody, maybe could at this point have moved under Rule

60 for relief from the denial of habeas relief in the District of Colorado because the factual assumption that the federal courts made in denying the federal petition had just been declared to be not a fact, but Comrie was by that time in a different federal prison in New York. He also could have commenced a new federal petition, but on June 16, 2012, only two weeks after the Superior Court decision, the BOP released Comrie from his federal sentence. Comrie was returned to DOC custody, and was released on parole on February 14, 2013. The DOC computed custody according to the order Judge Ammerman issued in 2011. Apparently neither the state courts nor the District Attorney had taken steps to notify the DOC of the Superior Court's 2012 decision vacating that order.

Comrie, continuing his multiple attempts to obtain earlier release, had also filed what he styled as a state petition for a writ of habeas corpus on January 3, 2012. Judge Ammerman promptly denied this as an untimely (possibly fifth) PCRA petition on January 13, 2012, and Comrie's appeal was rejected in an opinion by Judge Bender that stated "neither the trial court nor this Court has jurisdiction to address Appellant's sentencing [sic] claim." Commonwealth v. Comrie, No. 551 WDA 2012, 2013 WL 11280970 at *4 (Pa.Super. Feb. 26, 2013).

Comrie had also filed what was described in depositions as a mandamus action in Commonwealth Court seeking credit for his time in custody. Defendant Mazeski, representing the DOC in that action (which apparently never generated a decision), discovered the Superior Court's May 2012 unpublished decision vacating Judge Ammerman's grant of relief to Comrie, quoted in its decision issued two weeks after Comrie's parole in Commonwealth v Comrie, 551 WDA 2012 (Pa.Super. February 26, 2013). On March 26, 2013, Mazeski sent an email to Wood in her capacity as the Records Administrator for the DOC's Office of Population Management and Sentence Computation, and to Sears, counsel for the DOC. Mazeski informed Wood and Sears that he believed Comrie had been "technically erroneously released recently." ECF no. 37-2 at 52. Mazeski explained the history of Comrie's state sentence and concluded that after the Superior Court decision the DOC was

left with a sentencing order with no mention of credit and a [S]uperior [C]ourt decision saying it is too late for the sentencing court to give him credit. Yet, we gave him credit and he was paroled a few weeks ago. If we are to strictly follow[] court orders, he should be picked up. If we pick him up, he will file a petition arguing case law says he cannot be made to serve a sentence in installments and he gets to benefit from a mistaken release. I would guess that the commonwealth court, seeing that the county court made a mistake in its resentence order as to credit, would grant him relief. Can or should anything be done?

Id. Wood and Sears subsequently discussed the matter. Both recognized that taking the credit away for the period of January 19, 2002, to December 22, 2004, would deprive Comrie of any credit for that almost three-year period. Wood made the decision to

remove credit for the period of January 19, 2002, to December 22, 2004, "based on this most recent order." ECF no. 37-2 at 57. The DOC, through Wood, issued a revised DC16E form reflecting the removal of all previously awarded credit. Sears then filed a Petition for Issuance of a Bench Warrant in Clearfield County, attaching Wood's Affidavit of Unsatisfied Sentence for Plaintiff.

The transcript of the hearing on that petition on September 10, 2013, is at ECF no. 37-2 at 78-88, Exhibit 34. Judge Ammerman questioned whether notice had been given to Comrie, (it is not clear that the DOC had a current address for him, but as Judge Ammerman observed if Comrie had been paroled the Parole Board should have his address) but in the end without Comrie present and without appointing counsel to represent Comrie's interest Judge Ammerman proceeded with the hearing on the DOC's petition. Timothy Holmes, Esquire, who appeared for the DOC, requested that the court award Comrie credit for the period of January 19, 2002, to December 22, 2004. Judge Ammerman flatly declined to do this, and ordered the issuance of a bench warrant for Comrie's arrest and return to the DOC. Judge Ammerman's order contemplated no further proceedings, and specified that Comrie "be taken to such state prison as designated by the Department of Corrections ... and not to the Clearfield County Jail." ECF no. 37-2 at 90-91, Exhibit 35. Comrie was arrested approximately a year and a half later on that warrant and returned to DOC custody on May 29, 2015. Given the periods from January 19, 2002, to December 22, 2004, and from June 16, 2012, to February 14, 2013, Comrie had already served approximately four years on his 2-4 year sentence.

Once back in custody in 2015, Comrie filed another mandamus action in Commonwealth Court seeking credit for his time in custody. The Commonwealth Court denied relief because it believed that Comrie's remedy was in a direct appeal or a timely PCRA opinion. Comrie v. Pennsylvania Department of Corrections, 142 A.3d 995 (Pa.Cmwlth.2016). As the Commonwealth Court noted, in June 2015 Comrie also filed multiple unsuccessful PCRA petitions. Given the rulings by Pennsylvania's two intermediate appellate courts - each in effect pointing Comrie to the other - and given the limited scope of *coram nobis, see* Commonwealth v. Descardes, 635 Pa. 395, 136 A.3d 493 (2016), it is not clear Comrie had any state court remedies after the Superior Court's 2012 decision.

Comrie probably could have sought a federal writ as soon as he was arrested in June 2015, but it was in May 2016 that Comrie, in custody at S.C.I. Houtzdale, filed a federal habeas corpus petition seeking credit for time served on his state sentence. Comrie v. Smith, 3:16-cv-111-KRG-KAP (W.D.Pa.). The *pro se* petition was assigned to me, and as is normal I directed a response from the relevant prosecutor, the District Attorney for Clearfield County. Counsel subsequently appeared for Comrie and after discussion between counsel and a review of the record the District Attorney's Office agreed that

Comrie was in fact entitled to credit for time served.

A detour here: because I am a Magistrate Judge without the power to issue writs of habeas corpus in cases where all the parties had not consented to my jurisdiction, and because in light of the parties' agreement that Comrie be released it made no sense to issue a report and recommendation and have Comrie remain in prison pending the Court's review of my recommendation after a minimum of the two week period for objections, on October 25, 2016 I issued an order that was within my jurisdiction, releasing Comrie pending "further Order of Court" under the extraordinary circumstances doctrine of Landano v. Rafferty, 970 F.2d 1230 (3d Cir.1992). The DOC released Comrie from Houtzdale on October 27, 2016. Comrie was brought before me because there had been a petition for action filed in the Northern District of Ohio alleging that Comrie had violated the terms of his supervised release, and I ordered him removed to that district, where Comrie received a four-month sentence. Without objection, the habeas petition in this district was dismissed as moot the following January.

The standard for summary judgment requires the party seeking relief to show that under the relevant law no "reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Here, each side argues that the facts would require a verdict in its favor. It is agreed that the relevant law is the Eighth Amendment's requirement that prison officials not be deliberately indifferent to the risk of an unjustified deprivation of a person's liberty.  Sample v. Diecks, *supra*, 885 F.2d at 1110. As the Court of Appeals explained:

> To establish § 1983 liability in this context, a plaintiff must first demonstrate that a prison official had knowledge of the prisoner's problem and thus of the risk that unwarranted punishment was being, or would be, inflicted. Second, the plaintiff must show that the official either failed to act or took only ineffectual action under circumstances indicating that his or her response to the problem was a product of deliberate indifference to the prisoner's plight. Finally, the plaintiff must demonstrate a causal connection between the official's response to the problem and the infliction of the unjustified detention.

Comrie bases defendants' liability on their advice that Comrie's credit be removed (Sears and Mazeski) or their action in removing such credit and executing what Comrie argues is a false affidavit (Wood) in support of the petition for a bench warrant.

It is undisputed that defendants had, in Sample's words, notice of Comrie's "problem," *i.e.*, the removal of credit for the time period of January 19, 2002, to December 22, 2004.  It is also undisputed that Comrie ended up serving more than four years on the Clearfield County sentence, although the parties do not agree on how much.

It is also not disputable that defendants' actions conformed to the order of the

Superior Court holding that Judge Ammerman could not award credit to Comrie.  One can, if one wants, fault the Superior Court for not disregarding the formal defect in Comrie's PCRA petition or for not recharacterizing it as an action for mandamus and transferring it over to the Commonwealth Court. One can regret the timing of the Tenth Circuit's decision so close to Comrie's release from BOP custody or that Comrie, having obtained relief from Judge Ammerman in his fourth PCRA, did not immediately discontinue his other actions and appeals. One gets the impression from the hearing transcript that Judge Ammerman was very familiar with -and vexed by- the amount of litigation generated by Comrie and maybe felt a little schadenfreude that Comrie's predicament was due to the Superior Court's reversal of Judge Ammerman's favorable decision. But the Superior Court's order holding that Judge Ammerman had no jurisdiction to grant relief was a correct construction of the PCRA, and even if it had not been Judge Ammerman was not at liberty to defy the order of the Superior Court.

Neither were the DOC defendants. They recognized the damage inflicted by the Superior Court's order in the PCRA litigation but because PCRA petitions are litigated by the Office of the District Attorney, the DOC generally and the defendants as employees of the DOC had not been part of the PCRA litigation. After the fact, they were faced with a valid order by the Superior Court that mandated the removal of Comrie's custody credit. They recognized that Comrie had in fact served the time that the Superior Court held he could not be given credit for under the PCRA. Mazeski's email makes this clear: in his words, following the Superior Court ruling, the DOC was "left with a sentencing order with no mention of credit and a [S]uperior [C]ourt decision saying it is too late for the sentencing court to give him credit.  Yet, we gave him credit and he was paroled a few weeks ago.  If **we are to strictly follow[] court orders**, he should be picked up." ECF no. 37-2 at 52 (emphasis added).  In response to Mazeski's email, Sears reviewed the matter and concluded, "It appears that the DOC calculated [Plaintiff's] sentence with credit for the period 1/19/02 to 12/22/04, but that **the [] February 26, 2013 Superior Court Order made that void.  As a result**, [Plaintiff] was paroled before his minimum sentence expired." *Id*. at 55 (emphasis added).  In reply, Wood explains that, "We will take the credit away **based on this most recent order** …." Id. (emphasis added).  Sears replied, "This isn't a situation where a mistake was made.  His sentence was calculated correctly when he was paroled. **It only changed after the fact because of the Superior Court Opinion** …." *Id*. at 56 (emphasis added).  In the subsequently DC16E form, a Remark about the subject version of this form states, "Order from Superior Court vacates that previous PCRA order dated 6/9/2011 awarding credit.  **I[n] A[ccordance] W[ith] the Superior Court order** all previously awarded credit has been removed." *Id*. (emphasis added).

The defendants were clearly aware of the effect of the Superior Court's removal of credit for time that Comrie had served.  In her deposition, Wood testified that "we did

recognize the courts took away credit that they shouldn't have taken away and we did take the steps to contact the courts on his behalf to try to get that credit put back in place. Which is something that we -- as a matter of process, something we would not normally do, but we did do in Mr. Comrie's case." ECF no. 37-4 at 68-69 (depo. pages 67-68). Wood participated in a conference with Judge Ammerman and Attorney Holmes at which the DOC requested that the judge "fix this mistake and award Mr. Comrie back his credit." Id. at 71. In his deposition, Sears testified that although he did not recall specifically asking Attorney Holmes to ask the court to allow the DOC to credit Plaintiff for the time he has served, "there was a general feeling that we would like it if he had gotten the credit...." ECF no. 37-6 at 56 (depo. page 55). Sears explained, "It was one of those decisions that you see where we - we thought the Superior Court was harsh. You know, I - I viewed this as, you know, an unfortunate situation. You know, our hands - our hands were tied and I don't think any of us liked it." Id. Ultimately, at the hearing on the Petition for Issuance of Bench Warrant, Attorney Holmes requested, "Very frankly, Your Honor, I would like for you to award to Mr. Comrie the credit that you initially awarded to him previously in a 300-B from January 19, 2002, to December 22nd, 2004." ECF no. 37-2 at 82. Judge Ammerman's response was "Forget it. I don't do Mr. Comrie any favors for anything." Id. That, and not any action of the defendants, caused any harm suffered by Comrie.

Comrie ultimately obtained relief by an unopposed federal writ of habeas corpus. The only way the DOC defendants could have afforded Comrie release sooner would have been by ignoring what they considered the Superior Court's erroneous decision and never applying for a bench warrant. Comrie argues that defendants are liable precisely for that reason: they indisputably did not have an order expressly commanding them in so many words to remove credit for time served, and they could have used that as a reason for doing nothing to give effect to the Superior Court's decision.

This would have been a legally and politically hazardous course. When a convicted criminal properly released commits a new crime there is an almost reflexive condemnation of every aspect of the criminal justice system. Willie Horton and Robert "Mudman" Simon are only two examples of released criminals whose crimes altered the political trajectories of the nation and the Commonwealth. The defendants would have been well aware of the firestorm that would result if Comrie committed some crime as a result of being "improperly released" as a result of what would be described (and was described by Judge Ammerman, ECF no. 37-2 at 85) as their clerical error. But whether this was in the back of the defendants' minds or whether their actions were sheer bureaucratic plodding, it is not deliberate indifference to fail to come up with some novel way to undo an appellate court decision. Executive branch officials act illegally if they decide to ignore court orders because they think them incorrect. The defendants, and the DOC generally, attempted to resolve any hardship caused to Comrie by the Superior

Court's order with the sole legal avenue clearly at the DOC's disposal. In light of defendants' undisputed duty to comply with court orders and their effort to obtain for Comrie the credit to which he was entitled, no reasonable jury could find that anyone in the DOC acted with deliberate indifference to Comrie's plight.

The Clerk shall mark this matter closed.

DATE:  July 29, 2022

Keith A. Pesto,
United States Magistrate Judge

Notice by ECF to counsel of record